**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **INVISTA SÁRL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 1:07-CV-865** |
| **RHODIA S.A.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |
| | § | |

---

**DEFENDANT RHODIA S.A.'S MOTION TO DISMISS AND COMPEL ARBITRATION**
**OR STAY PROCEEDINGS IN FAVOR OF PENDING ARBITRATION AND**
**SUPPORTING MEMORANDUM OF LAW**

---

Gilbert I. Low
State Bar No. 12619000
D. Allan Jones
State Bar No. 10868500

ORGAIN, BELL & TUCKER, LLP
470 Orleans
Beaumont, TX  77701
Telephone:  (409) 838-6412
Fax:  (409) 838-6959

ATTORNEYS FOR DEFENDANT,
RHODIA

OF COUNSEL:

Jonathan Greenblatt
Christopher M. Ryan
SHEARMAN & STERLING LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 508-8000
Fax: (202) 661-7465

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

UNDISPUTED FACTS ................................................................................................... 2

STATEMENT OF THE ISSUES...................................................................................... 7

SUMMARY OF THE ARGUMENT ............................................................................... 8

ARGUMENT .................................................................................................................. 9

    I.   THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF ARBITRATION ............................. 9

        A.  Invista's Claims are Arbitrable "Disputes" within the Meaning of the JVA's
            Arbitration Agreement ............................................................................... 10

        B.  Rhodia S.A. May Compel Invista to Arbitrate its Claim Even Though it is not a Party
            to the Joint Venture Agreement .................................................................. 14

            1.  Rhodia S.A. has Assumed the JVA's Obligations for Purposes of this Proceeding
                and Arbitration ................................................................................ 15

            2.  Rhodia S.A. is Equitably Entitled to Invoke the JVA's Arbitration Clause ......... 17

        C.  Invista May Not Avoid the JVA's Arbitration Agreement......................................... 22

    II.  IN THE ALTERNATIVE, THE COURT SHOULD STAY PROCEEDINGS UNTIL ENTRY OF A FINAL
       AWARD IN THE PENDING ICC ARBITRATION .................................................... 25

        A.  The Court Should Stay Proceedings Under the Mandatory Stay Provision of 9 U.S.C.
            § 3................................................................................................... 25

        B.  The Court Should Stay Proceedings Under its Inherent Authority to Manage its Own
            Docket .................................................................................................. 27

CONCLUSION............................................................................................................. 28

# TABLE OF AUTHORITIES

## CASES

*Acevedo Maldonado v. PPG Industries, Inc.*, 514 F.2d 614 (1st Cir. 1975) ................................12

*American Bankers Insurance Group v. Long*, 453 F.3d 623 (4th Cir. 2006) ...............................17

*American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999) ...........24

*Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308 (11th Cir. 2005)........................................24

*Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347 (5th Cir. 2003) .......................14

*Celanese Corp. v. The BOC Group plc*, No. 3:06-CV-1462, 2006 WL. 3513633 (N.D. Tex Dec. 5, 2006)................................................................................................................20

*Clinton v. Jones*, 520 U.S. 681 (1997) .......................................................................................27

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985)...........................................................10

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060 (2d Cir. 1993)..................22

*Garcia v. Doe*, No. Civ. A. H-05-4321, 2006 WL. 840403 (S.D. Tex. Mar. 30, 2006)...............25

*Genesco, Inc v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840 (2d Cir. 1987) ........................................11

*Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524 (5th Cir. 2000) .......................... *passim*

*Gvozdenovic v. United Air Lines Inc.*, 933 F.2d 1100 (2d Cir. 1991) ..........................................16

*Harvey v. Joyce*, 199 F.3d 790 (5th Cir. 2000)...........................................................................26

*Hellenic Investment Fund, Inc. v. Detention Norske Veritas*, 464 F.3d 514 (5th Cir. 2006).........20

*Hill v. G.E. Power Systems, Inc.*, 282 F.3d 343 (5th Cir. 2002)...............................................8, 26

*Hughes Masonry Co. v. Greater Clark County School Building Corp.*, 659 F.2d 836 (7th Cir. 1981) ..............................................................................................................................18

*International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411 (4th Cir. 2000)............................................................................................................23, 24

*Invista North America SÀRL v. Rhodia Polyamide Intermediates S.A.S.*, 503 F. Supp. 2d 195 (D.D.C. 2007) ....................................................................................................16, 17

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir. 1988) .......... *passim*

*JLM Industries, Inc. v. Stolt-Nielsen S.A.*, 387 F.3d 163 (2d Cir. 2004) ................................17, 20

*Landis v. North America Co.*, 299 U.S. 248 (1936) ....................................................................27

*Long v. Silver*, 248 F.3d 309 (4th Cir. 2001) ............................................................................22

*MS Dealer Services Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999)............................17, 18, 20

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) ......................10

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1 (1983) .............10

*Neal v. Hardee's Food Systems, Inc.*, 918 F.2d 34 (5th Cir. 1990) ...............................................10

*P&P Industries, Inc. v. Sutter Corp.*, 179 F.3d 861 (10th Cir. 1999)...........................................12

*Pediatric Physician Alliance, Inc. v. Boyd*, No. 3:01-CV-0877, 2002 WL. 1315784 (N.D. Tex. June 11, 2002)................................................................................................................20

*Penzoil Exploration & Production Co. v. Ramco Energy Ltd.*, 139 F.3d 1061 (5th Cir. 1998) ....................................................................................................................................11

*Philips Petroleum Co. v. Marathon Oil Co.*, 794 F.2d 1080 (5th Cir. 1986) ...............................10

*Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110 (3d Cir. 1993) ........................22

*Sam Reisfeld & Son Import Co. v. Eteco*, 530 F.2d 679 (5th Cir. 1976) ......................................21

*Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999)............................................................11

*Subway Equipment Leasing Corp. v. Forte*, 169 F.3d 324 (5th Cir. 1999) ..................................26

*Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753 (11th Cir. 1993) ................ *passim*

*Matter of Talnott Big Foot, Inc.*, 887 F.2d 611 (5th Cir. 1989).....................................................10

*Thomson-CSF S.A. v. American Arbitration Association*, 64 F.3d 773 (2d Cir. 1995) .....14, 15, 22

*Washington Mutual Finance Group, LLC v. Bailey*, 364 F.3d 260 (5th Cir. 2004) .............. *passim*

*Waste Management, Inc. v. Residuos Industriales Multiquim, S.A.*, 372 F.3d 339 (5th Cir. 2004) ............................................................................................................................12, 25

*Webb v. Investacorp, Inc.*, 89 F.3d 252 (5th Cir. 1996)..................................................................8

*Will-Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211 (5th Cir. 2003)..................7, 8

*Yi Su v. T-Mobile USA, Inc.*, No. 3-04-CV-0654-L, 2004 WL. 1348740 (N.D. Tex. June
 15, 2004) ................................................................................................................25

## STATUTES

9 U.S.C. §§ 1-16 .................................................................................................................25

9 U.S.C. § 3 ............................................................................................................... *passim*

9 U.S.C. § 4 ...............................................................................................................1, 7

9 U.S.C. § 201, *et seq*..........................................................................................................2

9 U.S.C. § 202 ...................................................................................................................9

9 U.S.C. § 205 ...................................................................................................................1

9 U.S.C. § 206 ...............................................................................................................1, 9

9 U.S.C. § 208 ...............................................................................................................1, 25

28 U.S.C. § 1446(a) ...........................................................................................................1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **INVISTA SÁRL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 1:07-CV-865** |
| **RHODIA S.A.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |
| | § | |

## PRELIMINARY STATEMENT

Defendant Rhodia S.A., a company organized and operating under the laws of France,[1] files this Motion to Dismiss or Stay Proceedings in Favor of Arbitration pursuant to 9 U.S.C. § 206 and 9 U.S.C. §§ 3 and 4. The latter two provisions are applicable to foreign arbitration agreements by virtue of 9 U.S.C. § 208.

On November 13, 2007, Rhodia S.A. removed this action from the 260th Judicial District Court, Orange County, Texas, to this Court pursuant to 9 U.S.C. § 205 and 28 U.S.C. § 1446(a). At the same time, Rhodia S.A. provided notice of its intent to file a motion to dismiss or, alternatively, to stay these proceedings in favor of arbitration. *See* Notice of Removal, p. 1. Rhodia S.A. now, without waiving its special appearance in the 260th Judicial District Court, moves to dismiss this action in favor of arbitration as required by Article 23 of the ADN Joint

---

[1] Rhodia, as a *société anonyme*, frequently uses the name Rhodia S.A. to distinguish it from its affiliated companies. The name Rhodia S.A. is used in this Motion for that purpose.

Venture Agreement ("JVA") described more fully below.[2]  In the alternative, Rhodia S.A. moves

to stay proceedings in this Court pending entry of the final award in the previously-filed

international arbitration brought by defendant Rhodia S.A. and its affiliates against plaintiff

Invista SÀRL ("Invista"), a company organized under the laws of Luxembourg, and its affiliates,

before the International Chamber of Commerce in Paris, France (the "ICC Arbitration").  In

either case, Invista should be compelled to honor an arbitration agreement that clearly

encompasses this dispute, and should not be permitted to waste judicial resources and create the

risk of conflicting decisions by seizing this Court of the same claims that are already subject to

resolution in the ICC Arbitration.

**UNDISPUTED FACTS**

The following facts are derived from allegations in Invista's original state court petition

filed on October 9, 2007 (the "Original Petition" or "Orig. Pet."), Rhodia S.A's October 3, 2007

Request for Arbitration, as supplemented on October 19, 2007 (the "ICC Arbitration Request"),

the JVA, the September 7, 2007 letter from Rhodia S.A. affiliates to Invista affiliates, and

Invista's September 28, 2007 response to Rhodia affiliates.  The latter four documents are

referenced in the Original Petition and/or Invista's November 2, 2007 Petition for Temporary

Injunction.

1.     On April 23, 1974, DuPont de Nemours (France) S.A.S. ("DuPont France") and

Société de Usines Chimiques Rhône-Poulenc ("SUCRP") (predecessors of affiliates of Invista

---

[2] Nothing in this Motion to Dismiss or Stay Proceedings in Favor of Arbitration is intended to be a waiver of Rhodia S.A.'s pending challenge to the state district court's jurisdiction based on its alleged connections to or transactions in the State of Texas, or to raise any other defense to Invista's claims.  Invista's Original Petition asserts claims for misappropriation of trade secrets, unfair competition, conversion, and injunctive relief (Orig. Pet. ¶¶ 62-83).  The question of whether those claims must be arbitrated is the province of this Court under 9 U.S.C. § 201, *et seq.* and severable from the merits of the claims themselves.  Rhodia S.A. acknowledges that this Court has limited jurisdiction over it for purposes of resolving the arbitrability of this dispute.  Rhodia S.A. reserves the right, however, to challenge the jurisdiction of this Court or the state courts of Texas where jurisdiction is alleged to arise out of its alleged connections to or transactions in the State of Texas.

and Rhodia S.A.) entered into the JVA for the purpose of building a plant in Chalampé, France to produce adiponitrile (ADN), an intermediate used in the manufacture of nylon fiber, using a butadiene-based production technology that has come to be known as the "Gen I" process. (JVA, attached in relevant part as Exhibit 1 to the Affidavit of Emmanuel Murgue dated November 20, 2007 (the "Murgue Affidavit"), Art. 1.1[3]; *see also* Orig. Pet. ¶¶ 2, 25, 29.)

2.      Under the terms of the JVA, the DuPont and Rhône-Poulenc parties each assumed a 50 percent interest in a French general partnership (*société en nom collectif*), which subsequently became known as Butachimie S.N.C. (hereinafter referred to as "Butachimie"). (*Id.*)  The plant began manufacturing ADN in 1978 (Orig. Pet. ¶ 29), and is still operating today using the Gen I process.  (ICC Arbitration Request, attached as Exhibit 4 to the Murgue Affidavit, ¶ 10.)

3.      The JVA required the parties to supply Butachimie with technical assistance necessary for the construction and operation of the plant.  Article 9 of the JVA sets forth the parties' agreement concerning the use and disclosure of confidential technical information outside of the Butachimie joint venture.  That article provides, in its entirety:

> Neither party will disclose to third parties or use, except as otherwise agreed upon, for fifteen (15) years from the date of disclosure, confidential information with respect to the production of ADN or ADN hydrogenation disclosed to it by the other party or by [Butachimie], except for such information that:
>
>> (a) is or becomes publicly known through sources entitled to disclose the same,
>> (b) is known at the time of its receipt as shown by the recipient's prior written records, or
>> (c) is disclosed to the recipient by a third party entitled to disclose the same.

---

[3] Exhibit 1 to the Murgue Affidavit contains excerpts from both the French and English versions of the JVA.  The French version of the JVA is the governing agreement.  The English version, however, has been accepted by the original and successor parties to the JVA.  For the convenience of the Court, Rhodia S.A. refers herein to provisions of the English version.

4.      The same 15-year nonuse and nondisclosure requirement (from the date of the disclosure of information deemed confidential) is contained in the related License Agreement of April 23, 1974 between E.I. Dupont de Nemours and Company ("DuPont") and Butachimie contained in Exhibit C to the JVA (the "License Agreement") and the Secrecy and Ownership of Inventions Agreement of April 23, 1974, as subsequently replaced by a new agreement, the Secrecy and Technical Assistance Services Agreement dated August 9, 1990, contained in Exhibit D to the JVA (the "Secrecy Agreement").  (License Agreement, included, in relevant part, in Exhibit 1 to the Murgue Affidavit, Art. III(c); Secrecy Agreement of August 9, 1990, included, in relevant part, in Exhibit 1 to the Murgue Affidavit, Art 1.2.)

5.      Under the terms of the JVA, DuPont France agreed to settle all disputes arising in connection with the JVA exclusively by ICC arbitration in Paris, France.  Article 23 of the JVA thus provides, in its entirety:

> The parties hereto agree that **all disputes which may arise in connection with this Agreement** should be resolved between them and, when this is not possible, such disputes **shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with said Rules, arbitration to be held at Paris, France**.  The arbitrators will act as <u>amiable compositeurs</u>.  The decision of the arbitrators will be final. Enforcement of the award can be requested by either party through application to any court having jurisdiction.  This arbitration clause shall not apply to those Exhibits which contain their own arbitration clause. (Emphasis in bold; underline in original.)

6.      DuPont likewise agreed that any disputes arising in connection with the License Agreement or the Secrecy Agreement would be resolved exclusively by ICC arbitration.

(License Agreement, Art. VII; Secrecy Agreement, Art. VI.)

7.      Disputes arising in connection with the JVA and other relevant agreements will be resolved in accordance with French law.  (JVA, Art. 26; Licensing Agreement, Art. 14; Secrecy Agreement, Art. 6.)

8.      In 1997, the Rhône-Poulenc group transferred its chemicals and specialties business to Rhodia S.A.  (Orig. Pet. ¶ 32.)  SUCPR's interest in Butachimie was transferred to Rhodia S.A.'s subsidiary, Rhodianyl S.N.C. ("Rhodianyl") (*Id.*)

9.      In 2003, DuPont sold its nylon division (DuPont Textiles and Interiors) to the Koch group.  KoSa France Holding S.À.R.L. ("KoSa France"), a subsidiary of Invista organized under the laws of France, acquired DuPont France's shares in Butachimie effective April 30, 2004.  (*Id.* ¶ 33; ICC Arbitration Request ¶ 6.)

10.     In  the summer of 2007, in connection with a dispute between various Rhodia and Invista parties relating to different ADN technology (the GEN III technology), Invista accused Rhodia S.A. of misappropriating its GEN III technology for use in an ADN facility in Asia.  On September 7, 2007, Rhodianyl and Rhodia PI denied Invista's accusations and stated that "Rhodia has never used the Gen III technology . . . and does not plan to use it in Asia [or elsewhere]."  (Rhodia letter of September 7, 2007, attached as Exhibit 2 to the Murgue Affidavit, p. 4.)

11.     On September 28, 2007, Invista sent a letter to counsel for the Rhodia parties declaring that, in light of Rhodianyl and Rhodia PI's representation, "Rhodia"  must be intending to use Gen I technology to build a plant in Asia, and that "Rhodia" was prohibited "without limitation" from using or disclosing that technology outside of the Butachimie joint venture. (*See* Orig. Pet. ¶ 9; Invista letter of September 28, 2007, attached as Exhibit 3 to the Murgue Affidvait, pp. 1-2.)

12.     On October 3, 2007, Rhodianyl and Rhodia Opérations S.A.S. ("Rhodia Opérations") commenced the ICC Arbitration against plaintiff Invista, Invista North America SARL ("Invista NA"), a company organized under the laws of Luxembourg, and KoSa France (collectively, the "Invista respondents") pursuant to Article 23 of the JVA seeking a declaration regarding the scope and duration of the JVA's confidentiality obligation and a further declaration that Article 9 of the JVA authorizes Rhodia S.A. and its affiliates to disclose and utilize information regarding the GEN I technology in accordance with the JVA's express terms and conditions.  (*See* ICC Arbitration Request ¶ 19.)

13.     The International Chamber of Commerce registered the Arbitration Request under file number 15202/EC and notified the Invista respondents of the arbitration on October 5, 2007. (The ICC Arbitration Request (without exhibits), the ICC registration and notification, the addendum of October 19, 2007, and certified translations of each of these items, are collectively attached hereto as Exhibit 4 to the Murgue Affidavit.)

14.     On October 19, 2007, in order to make clear that Rhodia S.A. is bound by the arbitration proceeding, the Rhodia claimants filed an addendum to the ICC Arbitration Request, adding Rhodia S.A. as a party to that proceeding.  The Rhodia claimants also alerted the arbitral tribunal to Invista's parallel litigation in Texas court.  (*Id.*, addendum, ¶¶ 3-20.)

15.     On October 9, 2007, following receipt of notification of the ICC Arbitration, Invista filed its Original Petition in Texas state court, alleging that Rhodia S.A., by virtue of its control over its subsidiary Rhodianyl, misappropriated, or imminently will misappropriate, Invista's Gen I process to construct an ADN plant in Asia. (Orig. Pet. ¶¶ 4-7, 32.)  Invista specifically asserts that the technical information at issue was originally licensed by DuPont to

the Butachimie joint venture "solely for the benefit of the joint venture under the auspices of the JVA [and] the [L]icense [A]greement."  (*Id.* ¶¶ 28-29.)

16.      According to Invista, "[t]hroughout the course of the joint venture, DuPont and later INVISTA SÀRL and/or its affiliates routinely and on an ongoing basis provided Butachimie, subject to confidentiality restrictions, with additional confidential and proprietary know-how and process improvements … developed through their ongoing research and development, and through their experience in operating their other ADN plants in Orange, Texas and Victoria, Texas."  (*Id.* ¶ 36.)  Invista asserts that "Rhodia S.A. knew the Trade Secrets were confidential [because] [t]he JVA and other confidentiality agreements contain express restrictions regarding the use and transfer of confidential technical information such as the Trade Secrets."  (*Id.* ¶ 65.)

17.      Invista alleges misappropriation of trade secrets (*id.* ¶¶ 62-67), unfair competition (*id.* ¶¶ 68-71), and conversion (*id.* ¶¶ 72-76).  Invista seeks, in addition to damages and other relief, an injunction "enjoining Rhodia S.A. and its agents from making any use or disclosure of" Invista's Gen I technical information for any activity "other than in connection with the Butachimie joint venture."  (*Id.* ¶ 83.)

## STATEMENT OF THE ISSUES

Rhodia S.A. seeks dismissal of Invista's Original Petition in favor of arbitration pursuant to 9 U.S.C. § 4.  In the alternative, Rhodia S.A. requests that the Court stay these proceedings until entry of a final award in the ICC arbitration pursuant to either 9 U.S.C. § 3 or the Court's inherent authority.

In deciding whether to dismiss a case in favor of arbitration, the Court must determine whether the parties agreed to arbitrate their dispute and, if so, whether any federal statute or policy renders the claims non-arbitrable.  *See, e.g., Will-Drill Res., Inc. v. Samson Res. Co.*, 352

F.3d 211, 214 (5th Cir. 2003).  Determination of whether the parties agreed to arbitrate their

dispute involves two considerations: (1) whether there is a valid agreement to arbitrate between

the parties or equitable basis on which to compel arbitration; and (2) whether the dispute falls

within the scope of the governing arbitration agreement.  *See id.*  When deciding whether the

parties agreed, or can be compelled, to arbitrate particular disputes, courts generally should apply

ordinary principles that govern the formation of contracts.  In applying those principles,

however, due regard must be given to the federal policy favoring arbitration.  *See Webb v.*

*Investacorp, Inc*., 89 F.3d 252, 258 (5th Cir. 1996).

In deciding whether to stay a proceeding, 9 U.S.C. § 3 requires that proceedings "brought

in any of the courts of the United States upon any issue referable to arbitration" be stayed

pending the outcome of the arbitration.  The Court may also issue a discretionary stay of these

proceedings if the arbitrated and litigated disputes involve the same operative facts, the claims

asserted in the arbitration and litigation are "inherently inseparable," and the litigation would

have a "critical impact" on the arbitration.  *See Hill v. G.E. Power Systems, Inc.*, 282 F.3d 343,

347-48 (5th Cir. 2002).

## SUMMARY OF THE ARGUMENT

Invista has artfully selected the parties to this litigation and sought to apply non-

contractual labels to its claims in a transparent attempt to circumvent the arbitration provision

contained in the JVA (and other related agreements) entered into between affiliates of Rhodia

S.A. and Invista.  The JVA and related agreements set forth the confidentiality obligations

governing the purportedly misappropriated information at issue in this case.  It is abundantly

clear from Invista's Original Petition and subsequent pleadings that its claims presume the

existence of the JVA and rely upon its terms – including the confidentiality provisions.

Moreover, Invista's claims raise allegations of substantially interdependent and concerted

misconduct by Rhodia S.A. and its affiliate signatory to the JVA and other related agreements –

who chose arbitration as the method for resolution of disputes arising in connection with those

agreements.  Under the circumstances, ordinary principles of contract formation dictate that this

dispute should be arbitrated.  As is shown below, Rhodia S.A. is entitled to invoke the JVA's

arbitration agreement on the grounds of assumption and equitable estoppel.  Similarly, Invista is

equitably barred from avoiding arbitration under the theory of estoppel.  This case, therefore,

should be dismissed and Invista should be compelled to arbitrate.  At a minimum, to prevent the

possibility of inconsistent adjudications and in the interests of judicial economy, this case should

be stayed pending the final award in the ICC arbitration.

## ARGUMENT

### I.  THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF ARBITRATION

Article 23 of the JVA is a foreign arbitration agreement within the meaning of 9 U.S.C.

§ 202.  As such, 9 U.S.C. § 206 expressly authorizes this Court to "direct that arbitration be held

in accordance with the agreement."

Invista crafted its Original Petition in an effort to avoid the JVA's arbitration agreement.

Its avoidance efforts, however, are foreclosed by the express terms of the JVA and the decisions

of numerous courts.  *First*, although Invista pleads business torts rather than a breach of the JVA,

the agreement expressly contemplates that "all disputes" arising "in connection" with the JVA

shall be resolved through binding arbitration.  (JVA, Art. 23.)  The breadth of that language

brings both contract claims and related business torts within the scope of the arbitration clause.

(*See* text *infra* section I(A).)

*Second*, Rhodia S.A. is entitled to invoke the JVA's arbitration agreement against Invista.

Rhodia S.A. has assumed the JVA's obligations for purposes of this litigation and arbitration

and, therefore, is legally entitled to invoke the JVA's arbitration agreement.  (*See* text *infra*

section I(B)(1).)  Moreover, Rhodia S.A. is equitably entitled to invoke the JVA's arbitration agreement because Invista relies on the terms of the JVA and its claims allege substantially interdependent and concerted misconduct by both parties and non-parties to the JVA's arbitration agreement.  (*See* text *infra* section I(B)(2).)

*Third,* Invista is equitably prohibited from avoiding the JVA's arbitration agreement because it seeks to enforce the benefits and obligations of the JVA.  (*See* text *infra* section I(C).) As is shown below, the Fifth Circuit has clearly held that plaintiffs are bound to arbitrate their disputes under such circumstances.

**A.**     **Invista's Claims are Arbitrable "Disputes" within the Meaning of the JVA's Arbitration Agreement**

A party must arbitrate disputes where a contract so requires.  *See Matter of Talnott Big Foot, Inc.*, 887 F.2d 611, 614 (5th Cir. 1989).  In addressing questions of arbitrability, courts must "keep in mind the strong federal policy favoring arbitration."  *Neal v. Hardee's Food Systems, Inc.*, 918 F.2d 34, 37 (5th Cir. 1990) (citations omitted).  Courts are required to "rigorously enforce agreements to arbitrate," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985), and "any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Thus, "where a contract contains an arbitration clause, there exists a strong presumption that arbitration should not be denied 'unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'" *Philips Petroleum Co. v. Marathon Oil Co.*, 794 F.2d 1080, 1081 (5th Cir. 1986) (citations omitted). The federal policy in favor of arbitration has special force in matters involving international commerce.  *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 629-31 (1985).

Under the foregoing principles, Invista must arbitrate the claims in its Original Petition. The extremely broad arbitration clause in Article 23 of the JVA requires that "all disputes" arising "in connection with" the agreement be resolved through arbitration. The Fifth Circuit has expressly held that such broadly-worded arbitration clauses "embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Penzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (defining a "broad arbitration clause" to include language such as "any dispute that arises out of or in relation to" the agreement or disputes "connected with" the agreement). *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720-21 (9th Cir. 1999) (where an arbitration clause covered disputes "arising in connection with" an agreement, that broad clause encompassed every dispute having a significant relationship to that agreement or having its origin or genesis in that agreement and included antitrust claims, federal statutory claims, defamation claims, and claims of trade secret misappropriation); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988) (broad arbitration clause is not limited to the literal interpretation or performance of the contract, but embraces every dispute between parties having a significant relationship to the contract); *Genesco, Inc v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir. 1987) (broad arbitration language requires arbitration when the "allegations underlying the claims '*touch matters*'" covered by the parties' . . . agreements . . . , *whatever the legal labels attached to them*" (emphasis added)).

In a transparent attempt to circumvent the arbitration agreement in Article 23 of the JVA, Invista has deliberately avoided stating any claims alleging breach of the JVA and instead has sought to cast its claims as supposed business torts. Courts, however, have consistently rejected attempts by plaintiffs to avoid arbitration agreements by pleading their claims in tort rather than

contract.  As the Fifth Circuit explained, "[c]ourts determining whether a particular claim falls within the scope of the arbitration agreement 'focus on factual allegations in the complaint rather than the legal causes of action asserted.  If the allegations underlying those claims 'touch matters' covered by the parties' agreements, then those claims must be arbitrated whatever the legal labels attached to them.'"  *Waste Mgmt, Inc. v. Residuos Industriales Multiquim, S.A.*, 372 F.3d 339, 344 (5th Cir. 2004) (citations omitted).  Thus, parties to arbitration agreements cannot avoid those agreements "by casting their claims in tort, rather than contract."  *See Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 526 (5th Cir. 2000); *see also P&P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 871 (10th Cir. 1999) ("if the allegations underlying the claims 'touch matters' covered by the parties' [contract], then those claims must be arbitrated, whatever the legal labels attached to them"); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 758 (11th Cir. 1993) ("It is well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract." (citation omitted)); *Acevedo Maldonado v. PPG Indus., Inc.*, 514 F.2d 614, 616 (1st Cir. 1975) ("[b]road language [in an arbitration agreement] covers contract-generated or contract-related disputes between the parties however labeled: it is immaterial whether claims are in contract or in tort"); *J.J. Ryan & Sons,* 863 F.2d at 319 ("To decide whether an arbitration agreement encompasses a dispute a court must determine whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless of the legal label assigned to the claim.").

Accordingly, to be within the scope of a broad arbitration clause such as that contained in Article 23 of the JVA, the allegations need only touch upon the subject matter of the contract. As long as that test is met, it is irrelevant whether the claims sound in contract or tort.  The

allegations in the Original Petition make clear that Invista's claims have a significant relationship to the obligations imposed by the JVA.

Invista's allegations are premised upon an improper transfer of information from Butachimie to Rhodia S.A. in breach of the JVA. Indeed, Invista alleges:

- DuPont originally licensed technical information to Butachimie "solely for the benefit of the joint venture under the auspices of the JVA [and] the [L]icense [A]greement." (Orig. Pet. ¶¶ 28-29.)

- "Throughout the course of the joint venture, DuPont and later INVISTA SÀRL and/or its affiliates routinely and on an ongoing basis provided Butachimie, subject to confidentiality restrictions, with additional confidential and proprietary know-how and process improvements . . . developed through their ongoing research and development, and through their experience in operating their other ADN plants in Orange, Texas and Victoria, Texas." (*Id.* ¶ 36.)

- "Rhodia has used its power over entities in the Rhodia Group and their employees who were seconded to Butachimie to obtain the trade secrets. However, as Rhodia is fully aware, pursuant to the JVA, these employees were and are precluded from sharing the Trade Secrets they learned while working on behalf of Butachimie with Rhodia for any purpose other than the Butachimie joint venture." (Pet. for Temp. Inj. ¶ 38.)

The foregoing allegations not only rely on the existence of the joint venture relationship and presuppose the existence of the JVA, they seek to benefit from obligations created by the JVA and challenge conduct that Invista alleges violates the JVA's requirements. (*See id.* ¶ 65, ("Rhodia S.A. knew the Trade secrets were confidential [because] [t]he JVA and other confidentiality agreements contain express restrictions regarding the use and transfer of confidential technical information.")) Rhodia's legal entitlement to use information obtained as part of the Butachimie joint venture can only be determined by reference to the JVA. As shown above, the JVA provides that any dispute "in connection with" that agreement "shall" be resolved through arbitration. Under the circumstances, no matter how Invista crafts its claims, it cannot avoid the fact that the JVA governs the use and disclosure of the information at issue in

this case, and that any disputes concerning those rights must be resolved exclusively by international arbitration before the ICC, with the seat of arbitration in France.

**B.      Rhodia S.A. May Compel Invista to Arbitrate its Claim Even Though it is not a Party to the Joint Venture Agreement**

As part of its effort to avoid Article 23 of the JVA, Invista casts its lawsuit as a claim by a non-signatory to the JVA (Invista) against another non-signatory (Rhodia S.A.). Invista's accusation that "the Rhodia Group is attempting to use its complex structure" to bind non-signatories to arbitration is more than a little ironic. (Orig. Pet. ¶ 12.) It is in fact Invista that is seeking to use its corporate structure to avoid the binding commitment to resolve disputes by arbitration that are clearly within the scope of the relevant arbitration agreement.

Federal courts have recognized five theories, arising out of common principles of contract and agency law, that may bind non-signatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; and (5) equitable estoppel. *See, e.g., Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 356 (5th Cir. 2003); *Thomson-CSF S.A. v. Am. Arb. Ass'n.*, 64 F.3d 773, 776 (2d Cir. 1995). The theories of assumption and equitable estoppel are applicable to this case. *First*, for purposes of this proceeding and arbitration, Rhodia S.A. has assumed the obligations of the JVA and, as such, is entitled to invoke that agreement's arbitration clause. *Second*, Rhodia S.A. is equitably entitled to invoke the JVA's arbitration clause and Invista is equitably precluded from avoiding arbitration. In the Fifth Circuit, a defendant who is not a party to an arbitration agreement may invoke that agreement if the plaintiff's allegations presume the existence of and rely upon the terms of the contract containing the arbitration agreement. *See Grigson*, 210 F.3d at 527. Likewise, a plaintiff who is not a party to an arbitration agreement may be compelled to prosecute its claims in arbitration if he seeks to enforce benefits and obligations that arise out of

the contract itself.  *See Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 268 (5th Cir. 2004).

As is demonstrated below, Invista satisfies both of these criteria.  This lawsuit, therefore, should

be dismissed in favor of arbitration.

### 1. Rhodia S.A. has Assumed the JVA's Obligations for Purposes of this Proceeding and Arbitration

"In the absence of a signature, a party may be bound by an arbitration clause if its

subsequent conduct indicates that it is assuming the obligation to arbitrate."  *Thomson-CSF S.A.,*

64 F.3d at 777.  Rhodia S.A. has clearly assumed the JVA's obligation to arbitrate.  On October

3, 2007, Rhodianyl and Rhodia Opérations commenced an ICC arbitration against the Invista

respondents under Article 23 of the JVA.  On October 19, Rhodianyl, Rhodia Opérations, and

Rhodia S.A. filed an addendum to that arbitration notice, naming Rhodia S.A. as an additional

claimant.  In so doing, Rhodia S.A. assumed the JVA's substantive and procedural obligations

for purposes of arbitration and affirmatively consented to be bound by any award issued by the

arbitral tribunal.

Rhodia did this to make clear to the arbitral tribunal that it does not seek to hide behind

corporate formalities, but seeks to bind itself to the adjudication of the dispute by the arbitral

body chosen by the relevant affiliates of both sides' parent entities.  Unfortunately, this is not the

first time that such action was required in response to Invista's attempt to litigate in U.S. courts

disputes that are subject to the exclusive jurisdiction of an arbitral tribunal.  On December 22,

2006, in connection with the dispute concerning GEN III technology, Invista North America

SÁRL ("Invista NA") initiated a lawsuit against Rhodia PI in the United States District Court for

the District of Columbia, alleging that Rhodia PI improperly used confidential information

relating to "Gen III" ADN technology.  Invista NA sought compensatory, exemplary, and

equitable relief.  Invista NA pursued this litigation notwithstanding that Rhodia PI had

commenced a Swiss arbitration pursuant to the arbitration clause in the confidentiality agreement to which its affiliate Rhodianyl is a party (the "Confidentiality Agreement") raising the same issues and that, on December 29, 2006 (seven days after the complaint was filed), Invista NA itself initiated a Swiss arbitration against Rhodia PI and Rhodianyl alleging virtually identical claims (and seeking virtually identical relief) as those raised in its litigation.  (*See* ICC Arbitration Request, ¶ 14; Invista letter of September 28, 2007, attached as Exhibit 3 to the Murgue Affidavit.)  The Confidentiality Agreement governed the parties' mutual obligations with respect to the use of the purported confidential information.  Rhodia PI was not a party to the Confidentiality Agreement and, therefore, was not bound by that agreement's arbitration clause.  Nevertheless, because Rhodia PI had a legal interest in the outcome of the proceedings it did not challenge the tribunal's jurisdiction and affirmatively stated that it would be bound by the Confidentiality Agreement for purposes of the arbitration and pending litigation.

Rhodia PI successfully moved to dismiss Invista's DC litigation in favor of the pending arbitration.  In support of its motion, Rhodia PI argued that it had assumed the Confidentiality Agreement's obligations and thus was entitled to invoke that agreement's arbitration clause.  Rhodia PI also affirmed to the court that it was bound by the substantive obligations of the Confidentiality Agreement for purposes of the litigation and pending arbitration.  The court agreed with Rhodia PI and in dismissing the D.C. litigation (with prejudice) held that Rhodia PI's affirmative statements and "preparation for arbitration demonstrate[d] that it has assumed the obligation to arbitrate."  *Invista N. Am. SÀRL v. Rhodia Polyamide Intermediates S.A.S.*, 503 F. Supp. 2d 195, 202 (D.D.C. 2007) (citing *Gvozdenovic v. United Air Lines Inc.*, 933 F.2d 1100, 1105 (2d Cir. 1991) (noting that participation in arbitration demonstrates a party's clear intent to arbitrate the dispute even if the party is not a party to the arbitration agreement)).

In the present case, Rhodia S.A. has initiated arbitration against Invista, retained counsel, appointed its arbitrator, and engaged in preparatory work for the arbitration.  Such actions clearly show Rhodia S.A.'s intent to assume the obligations of the JVA.  *See* 503 F. Supp. 2d at 203 ("Rhodia PI has commenced arbitration pursuant to the arbitration clause in the Confidentiality Agreement against Invista SÀRL and has appointed the same arbitrator in both pending arbitration proceedings . . . . Rhodia PI's express statements, together with its actions, demonstrate that Rhodia PI has assumed the obligations of the Confidentiality Agreement, including the arbitration clause.").  Nevertheless, so as to avoid any confusion as to its position, Rhodia S.A. hereby affirms to this Court that it is bound by the substantive obligations of the JVA for purposes of this proceeding and arbitration.  Rhodia S.A. will abide by the determination of the arbitral tribunal regarding the scope and duration of the JVA's confidentiality agreement and the appropriate use of information conveyed as part of the joint venture relationship.  Under the circumstances, Rhodia S.A. is entitled to invoke the JVA's arbitration agreement.

### 2. *Rhodia S.A. is Equitably Entitled to Invoke the JVA's Arbitration Clause*

Even if the Court does not find that Rhodia S.A. has assumed the JVA's obligations, it is entitled to invoke the JVA's arbitration agreement on the ground of equitable estoppel.  The doctrine of equitable estoppel allows a non-party to invoke an arbitration agreement "when the action is intertwined with, and dependent upon, th[e] contract" containing the agreement.  *See Grigson*, 210 F.3d at 527; *accord Am. Bankers Insur. Group v. Long*, 453 F.3d 623, 626-627 n.3 (4th Cir. 2006); *JLM Indus., Inc. v. Stolt-Nielsen S.A.*, 387 F.3d 163, 178 (2d Cir. 2004); *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999); *Sunkist Soft Drinks, Inc. v.*

*Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993); *Hughes Masonry Co. v. Greater Clark Cty. Sch. Bldg. Corp.*, 659 F.2d 836, 838-41 (7th Cir. 1981).

The Fifth Circuit has held that a non-signatory defendant may invoke an arbitration agreement on the grounds of equitable estoppel in two circumstances. *First*, when "*the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory*." *Grigson*, 210 F.3d at 527 (italics in original) (citing *MS Dealer*, 177 F.3d at 947). This test is satisfied when each of the plaintiff's claims "*makes reference to or presumes the existence of* the written agreement." 210 F.3d at 527 (emphasis added); *see also id.* at 531 (finding that estoppel is appropriate where claims are "dependent upon" the contract). As the *Grigson* court explained, applying equitable estoppel in this circumstance prevents a plaintiff from "'hav[ing] it both ways': it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Id.* at 528.

*Second*, equitable estoppel is appropriate when a plaintiff "raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Id.* at 527 (original in italics) (quoting *MS Dealer*, 177 F.3d at 947). Where a lawsuit alleges concerted conduct by a non-signatory and a signatory, estoppel is justified because the signatory is "in essence" a defendant. 210 F.3d at 528. By having its actions examined in court, the signatory, even though not named as a defendant, will be forced to participate in the litigation through discovery and otherwise. *See id.* As a result, the signatory's right to arbitrate — including its right to avoid expensive and time-consuming litigation — will be impaired. *See id.*

Equitable estoppel may be justified under either prong of the *Grigson* test, although estoppel "is much more readily applicable when the case presents both independent bases . . . for applying the intertwined-claims doctrine." *Id*. at 527-28.  In this case, both prongs of the *Grigson* test are satisfied.  *First*, Invista's claims presume the existence of the JVA and rely upon its terms and conditions.  As stated above, Invista alleges that "Rhodia S.A. used its control over its affiliates . . . to misappropriate the Trade Secrets" that were received "solely for use in connection with the joint venture." (Orig. Pet. ¶ 4.)[4]  Invista further alleges that "Rhodia S.A. knew the Trade Secrets were confidential [because] [t]he JVA and other confidentiality agreements contain express restrictions regarding the use and transfer of confidential technical information such as the Trade Secrets." (*Id.* ¶ 65.)  In addition to allegations that rely upon the JVA — that Rhodia S.A. has misappropriated trade secrets provided to Rhodia S.A.'s affiliates pursuant to the JVA  — the relief that Invista seeks requires a court to make a determination of the parties' respective obligations under the JVA.  Indeed, Invista seeks damages and a "declaratory judgment that [Rhodia S.A.] has no right to use the Trade Secrets for its own use or benefit and, specifically, that Defendant may not use Plaintiff's Trade Secrets." (*Id.* p. 23.)  The joint venture relationship is governed by the JVA and, as such, the question of whether and how purportedly confidential information obtained through that relationship may be used can be answered only by reference to the JVA's express terms and conditions.  Invista's ability to succeed on its claims, therefore, is dependent upon a finding that the JVA was breached.  As such, its claims necessarily presume the JVA's existence and rely upon its terms.

---

[4] In its Petition for Temporary Injunction, Invista elaborates by saying, "DuPont and Invista provided their Trade Secrets to Butachimie only pursuant to restrictions which prohibit the disclosure and use of the trade secrets for any purpose outside the joint venture, and with the shared understanding that the Trade Secrets are confidential, proprietary trade secrets." (Pet. for Temp. Inj. ¶ 3.)  Leaving aside the question of whether Invista's statement is factually correct, this statement (along with others cited above) clearly requires a determination of the parties' mutual rights and obligations under the JVA and, as such, demonstrates the appropriateness of applying equitable estoppel in this case.

Courts have consistently held that such circumstances justify the application of equitable estoppel. *See, e.g., MS Dealer*, 177 F.3d at 947-48 ("Although [the buyer] does not allege that the service contract has been violated or breached in any way," estoppel was appropriate because "each of her fraud and conspiracy claims depends entirely upon her contractual obligation to pay $990.00 for the service contract."); *Sunkist*, 10 F.3d at 758 (estoppel appropriate where tort claims against non-signatory parent corporation "presum[ed] the existence of [the] agreement"); *JLM Indus.*, 387 F.3d at 178 (estoppel warranted where claims must "make[ ] reference to or presume[ ] the existence of the written agreement" (quotation omitted)); *Pediatric Physician Alliance, Inc. v. Boyd*, No. 3:01-CV-0877, 2002 WL 1315784, at *4 (N.D. Tex. June 11, 2002) (first prong of Grigson met where plaintiff's claims "presume[d] the existence" of the contract); *see also Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 518 (5th Cir. 2006) (estoppel appropriate where claims were "premised in part upon the agreement").[5]

The *second* prong of *Grigson* is satisfied because Invista's claims "[raise] allegations of substantially interdependent and concerted misconduct" by Rhodia S.A. and its JVA signatory affiliates. *Grigson*, 210 F.3d at 527.[6]  Invista alleges that Rhodia S.A. came into possession of its "trade secrets" through its "control" of the Rhodia employees seconded to Butachimie.  (Orig. Pet. ¶ 5.)  As such, its signatory affiliates' conduct is intertwined with Rhodia S.A.'s for purposes of deciding the merits of Invista's claims.  Invista seems to be alleging some form of

---

[5] In *Celanese Corp. v. The BOC Group plc*, No. 3:06-CV-1462, 2006 WL 3513633 (N.D. Tex, Dec. 5, 2006), the Northern District of Texas denied a non-signatory defendant's motion to compel a non-signatory plaintiff to arbitrate.  That case, which is on appeal to the Fifth Circuit, is both wrongly decided and factually distinguishable.  In that case, the court declined to apply equitable estoppel because, in the court's view, the non-signatory defendant had consciously opted out of the arbitration clause of the relevant agreement.  No such finding can be made here.  Accordingly, that case should not influence this court's consideration of Rhodia S.A.'s motion.

[6] It is irrelevant for purposes of *Grigson's* second prong that Invista did not name Butachimie as a defendant.  In *Grigson*, the Fifth Circuit held that the second prong was met even though the signatory, TriStar, was not named as a defendant. 210 F.3d at 531.  The Court explained that arbitration was proper because "[a]lthough not sued (an obvious attempt to make an end-run around the arbitration clause)," TriStar was "in essence . . . a party, with resulting loss, inter alia, of time and money because of its required participation in the proceeding." *Id.* at 528, 530.

---

group-liability theory based on the claim that "the Rhodia Group is attempting to use its complex structure . . . to misappropriate Invista SÀRL's Trade Secrets . . . ." (*Id.* ¶ 12.)  Invista's strategy of grouping all Rhodia entities together is evidenced by the fact that it seeks to enjoin Rhodia S.A. "its subsidiaries, affiliates and agents" from making use of its purported "Trade Secrets." (Pet. for Temp. Inj. at p. 21.)  Invista also seeks to enjoin "Rhodia from employing, consulting, or otherwise using in any capacity certain individuals to be identified who are now or were previously seconded to or otherwise now act or previously acted on behalf of or provided services to the Butachimie joint venture who had access to Trade Secrets" from engaging in any activity related to Rhodia S.A.'s proposed China ADN facility.  (*Id.* at p. 21.)

As these statements make clear, Invista draws no distinction between Rhodia S.A. and its affiliates (including parties to the JVA) for purposes of this litigation.  By grouping these entities together, Invista has intertwined their alleged misconduct and has inextricably linked its claims and requested relief to the JVA's terms and conditions.  This is precisely the situation the doctrine of equitable estoppel was intended to prevent.  As such, Invista may not avoid the JVA's arbitration agreement.

In addition to *Grigson*, numerous other cases compel arbitration in circumstances like those presented in this case.  In *Sam Reisfeld & Son Import Co. v. Eteco*, 530 F.2d 679, 681 (5th Cir. 1976), the Fifth Circuit held that the claims against nonsignatory defendants, including the parent corporation of the signatory defendant, should be stayed pending arbitration because they were based on the same operative facts and were inherently inseparable from the claims against the signatory defendant.  In so holding, the court explained, "[i]f the parent corporation was forced to try the case, the arbitration proceedings would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted."  *Id.*  Similarly, in *J.J. Ryan & Sons*,

the Fourth Circuit held that "[w]hen the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement." 863 F.2d at 320-21.

Other courts of appeals have reached similar conclusions.  *See, e.g., Sunkist Soft Drinks, Inc.*, 10 F.3d at 757-58 (where plaintiffs brought action against signatory and signatory's parent corporation, claims against latter were subject to arbitration given the fact that "each claim presumes the existence of [the agreement between Sunkist Growers and Sunkist Soft Drinks]," and the "integral relationship" between the parent and the subsidiary); *Long v. Silver*, 248 F.3d 309, 319-21 (4th Cir. 2001) (holding that shareholders of a corporation who were also members of the corporation's board of directors could invoke the arbitration provision of an agreement between the plaintiff and the corporation because the claims against the shareholders and corporation were "closely intertwined"); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110, 1122 (3d Cir. 1993) (claims against sister corporation fall within arbitration agreement based on agency principles).

## C.    Invista May Not Avoid the JVA's Arbitration Agreement

Just as Rhodia S.A. is equitably entitled to invoke the JVA's arbitration agreement, Invista is equitably estopped from avoiding arbitration.  As the Fifth Circuit explained (quoting the Second Circuit), while arbitration is contractual by nature:

> It does not follow . . . that under the [Federal Arbitration] Act an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision. [We have made] clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency.

*Washington Mut. Finance Group, LLC,* 364 F.3d at 268 (citing *Thomson-CSF, S.A.*, 64 F.3d at 776).

In *Bailey*, the Fifth Circuit held that a plaintiff who is not a party to a contract that contains an arbitration provision cannot avoid the requirements of that provision when it seeks to enforce benefits and obligations that arise out of the contract itself.  *See* 364 F.3d at 268.  There, the wife of a man who had signed various loan and credit insurance agreements containing arbitration clauses brought suit in the Mississippi state courts alleging that Washington Mutual Finance Group, LLC (the "Washington Group") sold them insurance that they neither needed nor wanted.  The Washington Group then filed a separate action in federal court seeking to stay the state court proceedings and to compel arbitration.  The wife defended the action by arguing that she never signed the underlying contracts and, therefore, was not a party to the arbitration provision.

The Fifth Circuit held that because the wife sought the benefits of the contract, she was estopped from denying the applicability of the arbitration provision, explaining that:

> In the arbitration context, the doctrine [of estoppel] recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently manifested that other provisions of the same contract should be enforced to benefit him. To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.

*Id.* at 268 (insertions in original) (quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000)).[7]

The Eleventh Circuit reached the same conclusion in *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1312 (11th Cir. 2005).  In that case, the plaintiff sought to enforce statutory rights derived from her status as a "borrower" under a promissory note that she had not signed.

---

[7] The determination whether a non-signatory is equitably estopped by availing itself of direct benefits under the contract is a question of federal law.  *See Washington Mutual Finance Group, LLC*, 364 F.3d at 267 n.6 .

When the defendant sought to compel arbitration according to the terms of the promissory note, the plaintiff argued that she was not a party to the contract and, therefore, could not be compelled to arbitrate her claims.  The court rejected that argument, holding that although the plaintiff had made statutory claims, her right to make those claims arose from her alleged status under the promissory note.  *Id.*  As such, she could not both rely on the note to establish her claims and avoid its obligations.  *Id*.

Other courts have similarly concluded that a non-signatory claiming direct benefits under an agreement is equitably estopped from avoiding that agreement's arbitration clause.  *See*, *e.g.*, *Int'l Paper Co.*, 206 F.3d at 418 (non-signatory plaintiff could not seek to enforce rights under a contract and avoid its arbitration clause); *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1063-64 (2d Cir. 1993) (non-signatory firm that had received a copy of the agreement governing use of a trade name and used the trade name was estopped from avoiding the arbitration clause contained in the agreement); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (non-signatory estopped from avoiding arbitration when it had received direct benefit of lower insurance rates and ability to sail under the French flag from an agreement containing arbitration clause).

Under the foregoing principles, Invista should be estopped from avoiding arbitration of its claims.  The doctrine of estoppel prevents parties from "having it both ways."  *Bailey*, 364 F.3d at 268 (quoting *Grigson*, 210 F.3d at 528).  That is precisely what Invista is attempting to do here by relying on the JVA's confidentiality provisions to prevent Rhodia S.A. from using certain information that it believes is confidential while simultaneously attempting to avoid other parts of the same contract that it views as a burden — namely, the foreign arbitration agreement in Article 23.  As the Fifth Circuit explained in *Grigson*, "[t]he linchpin for equitable estoppel is

equity-fairness.  For the case at hand, to not apply th[e] intertwined-claims basis to compel

arbitration would fly in the face of fairness."  210 F.3d at 528.  The *Grigson* court's reasoning is

equally applicable here.  It would be fundamentally unfair to allow Invista to benefit from the

JVA while avoiding that agreement's requirement that disputes be arbitrated.

## II.   IN THE ALTERNATIVE, THE COURT SHOULD STAY PROCEEDINGS UNTIL ENTRY OF A FINAL AWARD IN THE PENDING ICC ARBITRATION

In the alternative, this Court should stay proceedings pending the final award in the

ICC Arbitration, under either the mandatory stay provision of 9 U.S.C. § 3 (as made applicable

to foreign arbitration agreements by 9 U.S.C. § 208) or the inherent authority of this Court to

manage its own docket.

### A.   The Court Should Stay Proceedings Under the Mandatory Stay Provision of 9 U.S.C. § 3

The Federal Arbitration Act provides that a proceeding "brought in any of the courts of

the United States upon any issue referable to arbitration" "shall" be stayed pending the outcome

of the arbitration.  9 U.S.C. § 3.  Section 3 is mandatory.  *See Garcia v. Doe*, No. Civ. A. H-05-

4321, 2006 WL 840403, at *4 (S.D. Tex. Mar. 30, 2006); *Yi Su v. T-Mobile USA, Inc.*, No. 3-04-

CV-0654-L, 2004 WL 1348740, at *2 (N.D. Tex. June 15, 2004).  Section 3 applies to foreign

arbitration agreements by virtue of 9 U.S.C. § 208, which provides for "residual application" of

chapter 1 (9 U.S.C. §§ 1-16) "to the extent that that chapter is not in conflict with this chapter or

the Convention [on the Recognition and Enforcement of Foreign Arbitral Awards of June 10,

1958] as ratified by the United States".

Even if the Court declines to dismiss this case in favor of arbitration, it should

nevertheless stay these proceedings pending the outcome of the ICC Arbitration.  In *Waste*

*Management*, 372 F.3d at 343, the Fifth Circuit held that the Federal Arbitration Act required a

court to stay proceedings against a non-signatory pending the outcome of arbitration when

(1) the arbitrated and litigated disputes involve the same operative facts, (2) the claims asserted in the arbitration and litigation are "inherently inseparable," and (3) the litigation would have a "critical impact" on the arbitration.  *See Hill*, 282 F.3d at 347-48 (Federal Arbitration Act (9 U.S.C. § 3) required stay of proceedings when claims to be arbitrated were "inseparable in any practical way" from those to be resolved in litigation); *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 329 (5th Cir. 1999) (even though claims against corporation's affiliates were not subject to arbitration, those claims would be stayed pending the outcome of arbitration to avoid affecting the corporation's right to arbitration); *Harvey v. Joyce*, 199 F.3d 790, 795-96 (5th Cir. 2000) (claims against a non-party to an arbitration agreement should be stayed pending outcome of co-defendant's arbitration with plaintiff when claims are "inherently inseparable" because failure to stay would render arbitration "redundant and meaningless").

The three factors specified in *Waste Management* support a stay of Invista's claims here.  *First*, the operative facts giving rise to Invista's claims are identical to those that will be arbitrated — the purported use of Invista's "trade secrets."  *Second*, the Original Petition makes no distinction between the alleged conduct of Rhodia S.A. and its affiliates.  Rather, Invista argues that Rhodia S.A. and its signatory affiliates acted together to impermissibly disclose and use its "trade secrets."  As in *Waste Management*, Invista seeks damages and equitable relief from all relevant Rhodia entities for a single set of alleged harms.  *Third*, given the overlapping issues in the litigation and arbitration (*i.e.*, the scope and duration of the JVA's confidentiality obligations and the parties' respective obligations with respect to confidential information), the arbitration "would necessarily be strongly influenced to follow that court's determination." *Waste Mgmt*, 72 F.3d at 345.  As in *Waste Management*, failure to stay these proceedings could be used by Invista to claim that arbitration against the Invista respondents would be "redundant

and meaningless." Moreover, it could deny Rhodia the benefits of the arbitration for which it contracted, create the possibility of inconsistent judgments, and contravene the strong federal policy in favor of arbitration.

**B.    The Court Should Stay Proceedings Under its Inherent Authority to Manage its Own Docket**

If the Court determines that Invista is not bound by Article 23 of the JVA and that a mandatory stay is not required by 9 U.S.C. § 3, it should nonetheless stay the proceedings under its inherent authority to manage its own docket. The Supreme Court has held that "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. North America Co.*, 299 U.S. 248, 254-55 (1936) (citations omitted); *see Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.").

Arbitration of the true dispute underlying Invista's Original Petition would necessarily involve questions that are material to the outcome of this litigation, such as the scope and duration of the JVA's confidentiality obligations. Indeed, the relief sought by Invista is predicated upon a finding that Rhodia S.A. is barred from using information purportedly obtained through the ADN joint venture relationship. Those issues will be determined in the ICC Arbitration. Rhodia S.A. is a party to that arbitration and, therefore, will be bound by any adverse award the tribunal might issue. This Court should stay proceedings in this action pending the ICC arbitral tribunal's interpretation of the parties' respective obligations under the JVA.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Invista's Original Petition in favor of arbitration.  In the alternative, this Court should stay proceedings in this action pending entry of a final award by an ICC arbitral tribunal.

Respectfully submitted,

By:_____

Gilbert I. Low
State Bar No. 12619000
D. Allan Jones
State Bar No. 10868500

ORGAIN, BELL & TUCKER, LLP
470 Orleans
Beaumont, TX  77701
Telephone:  (409) 838-6412
Fax:  (409) 838-6959

ATTORNEYS FOR DEFENDANT, RHODIA

OF COUNSEL:

Jonathan Greenblatt
Christopher M. Ryan
Shearman & Sterling LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 508-8000
Fax: (202) 661-7465

DATED: November 20, 2007

## CERTIFICATE OF SERVICE

The foregoing document is being served in accordance with the Federal Rules of Civil Procedure by electronic mail and/or hand delivery on the following counsel of record on this 20th of November 2007.

Lawrence L. Germer and Larry J. Simmons
Germer Gertz L.L.P.
P.O. Box 4915
Beaumont, Texas 77704

_____
D. Allan Jones